Black Elk Energy Offshore Operations, LLC. Richard Schmidt v. Schmlow, Rechnitz, and Tamara Rechnitz, et al. May it please the Court, Brian Coy for Appellants Schlomo and Tamara Rechnitz, I've reserved five minutes for rebuttal. This case arises out of a bankruptcy adversary proceeding. Their underlying bankruptcy sprung from a criminal fraud perpetrated by Mark Nordlicht and his fund Platinum Partners. The $10 million judgment against appellants here, who had no knowledge of the fraud and were victims of it, was a result of the bankruptcy court's misguided attempt to do equity. The judgment should be reversed for three discrete and independent reasons. The first one is jurisdictional. By the time judgment had been entered, the litigation trustee's trust had expired, which made the adversary proceeding moot and divested the bankruptcy court of jurisdiction and now, by extension, divests this court of jurisdiction. The second reason is that the bankruptcy court improperly held that appellants could not avail themselves of Section 550B's good-faith defense, notwithstanding the fact that it was undisputed at summary judgment that they lacked actual subjective knowledge of the fraud. The third reason is because the bankruptcy court erred in granting summary judgment on tracing. The bankruptcy court ran afoul of Rule 56 by resolving a disputed fact issue at the summary judgment stage and compounded that error by applying a novel and unsupported tracing methodology, a fact-finding tool, at the summary judgment stage to resolve a statutory factual element. Now, counsel, I tend to agree with you that the first issue we ought to address is jurisdictional because if we don't have jurisdiction because the litigation trust dissolved, then we don't need to get to anything else. So you appealed the judgment—I may get this wrong, but you can correct me—you appealed the judgment of the bankruptcy court with respect to the dissolution of the trust, right, to the district court? We sought an interlocutory appeal to the district court. Did you say at the time—the point of my question is was that a final order or an interlocutory order? It was an interlocutory order. Did you argue that it was final or interlocutory at the time? It was undisputed that it was an interlocutory appeal with approval from the district court. Okay. You didn't argue that it was final at the time? No. Okay. So if it were final, if it were final, then you didn't seek a review here, right? Well— And so that issue would be over with because you didn't seek review of it. Well, I would disagree with that, Your Honor, because— Even if it was final, we can still address it? Yes, because as this Court has recognized in the matter of Dorsey case, appeals arising out of a main bankruptcy proceeding or an adversary proceeding are independent appellate events. The appeal here puts forth that the trustee lacked standing to pursue the adversary proceeding. We are appealing only the final judgment in the adversary proceeding. I understand that's a final judgment. I mean the discrete judgment that the trust had not dissolved, litigation trust had not dissolved. You sought review on it in the district court. The district court disagreed with you, and then you didn't seek any further review, right? The district court didn't disagree with us in the merits that disagreed— No standing. —held that we had standing. And under settled res judicata principles, if one does not have appellate standing to pursue an appeal, there's no res judicata effect from some other proceeding of the ruling. In any event, I think it's undisputed that there was no final judgment against appellants that had been entered. Do we do our finality a little bit more flexibly in bankruptcy than we do in normal litigation? Yes, Your Honor, but I think that gets, to some extent at least, to the person aggrieved test where it was held by the district court, obviously, that appellants didn't have standing under the person aggrieved test. There's no requirement that you exhaust appeals in some other proceeding, particularly not interlocutory appeals, to appeal a final judgment in an adversary proceeding. It was right that appellants were not persons aggrieved at the time of the district court appeal of the order. By the dissolution, by the failure to dissolve the trust. Yes. But— Yet you want to argue about it now. Correct, because now it is, I think, beyond fair dispute that appellants are persons aggrieved. They were persons aggrieved then by the lack of dissolution of the trust, but they are persons aggrieved now by the lack of dissolution of the trust. Correct. And that's compelled by the case law principally cited by the trustee, and here's why. Under all the cases the trustee cites where an adversary proceeding defendant was held to be not a person aggrieved, the holding was you are not a person aggrieved by virtue of defending against an adversary proceeding. But once there is a final judgment entered in an adversary proceeding, here appellants face a $10 million final judgment. There's no question— I think they were aggrieved, definitely aggrieved by that. There's no question they've been directly, adversely, and financially aggrieved. All you're trying to do, I think, is collaterally attack the judgment that the trust, the litigation trust had not dissolved. And you want to argue about that now. We're not—what we are attacking is the final judgment. We're not even directly attacking the order of the bankruptcy judge in the main proceeding. The assertion is that— In respect to the litigation trust not dissolving? The assertion, Your Honor— You want us to reverse on that grounds. You want us to say that there's no jurisdiction here because the litigation trust had, in fact, dissolved by its own. And I think you have a good argument on that, to be fair. You want to say, though, that because the litigation trust actually dissolved after the three-year period, that we have no jurisdiction here, right? That's correct. Okay. And the assertion—an analogy I would give is to a 1292B type appeal. Party tries to appeal an interlocutory order. The Court of Appeals holds that you have not met the 1292B standard or that you don't have standing to raise an interlocutory appeal. That doesn't foreclose you from later appealing that issue when there's a final judgment entered against the party. The same here. In fact, putting forth a standard that would have required appellants to seek Fifth Circuit review of that bankruptcy court order for lack of standing, one, there's just no authority suggesting any such sort of exhaustion requirement. Part two, it would completely run afoul of what the person aggrieved test is trying to accomplish. The person aggrieved test is trying to avoid adversary proceeding defendants or other participants in a bankruptcy needing to appeal all the time, filing what's been called sclerotic appeals of orders. If the court were to foreclose appellants for pursuing this appeal here, the result would be adversary proceeding defendants and other participants in a bankruptcy would need to file appeals even if they didn't have standing. But you did. You did file an appeal of the judgment that the trust had not dissolved. Yes, that's correct. And you did not, I'll just ask it again, you did not characterize that as a final order that was immediately appealable as of right? I need to check the record for exact— I thought you did, and they said it was not. They might have said it was interlocutory. I thought you said it was final. I'm just trying to get clear what the parties are arguing because there's really not much time spent on this in the briefing. Yes, and I agree with that, which is another reason why I started with it in argument. And I do, and I can while they're arguing, refresh myself on exactly the assertion we made. It's obviously in the record. You need to do, if each side needs to do a 28-J on this, that would be acceptable. That would be acceptable of what was argued at the time. That would be just a short 28-J, not to exceed two pages each. We can do that because— Each side can do that within three business days. Okay, so let's continue on though. I did want to ask a question because your time is ticking away, although this is a crucial issue obviously. ASARCO and Ritson would treat it as final, wouldn't they? So what case do you have that would say this wasn't final? Respectfully, Your Honor, I would like to incorporate that in the 28-J letter. Okay, that's fine. Did you want to continue with your next argument? Yes. On the trust's language itself, I think that's fairly self-explanatory. Section 8.01 has an automatic expiration date. I'd like to move on to the good faith issue unless there are further questions. On the good faith issue, so I get your argument. You're saying it's got to be actual knowledge, it can't be constructive knowledge. And you're saying there's no actual knowledge here, instead it's sort of this imputed from the agent to the principal. Yes. So give me your best case that the imputed from the agent to the principal is not enough to meet this sort of good faith standard. The cases we've cited from other circuits, the Madoff case in the Second Circuit is probably the most descriptive of the subjective aspect of Section 550B. Is that about imputation or refusal to impute knowledge from the agent to the principal? It doesn't. And we agree that there is not a circuit case that has directly, in some sense this is an issue of first impression. I find it a difficult issue, to be honest with you. It is a difficult issue. Knowledge, as Your Honor knows, is used unadorned in this statute. It's not defined in the statute. But I think what's important is that the use of the word knowledge unadorned, when Congress actually knows how to say notice or knowledge, or knowledge including . . . Can I go look at the common law background of agency principles here then to figure out sort of what's the, you know, what background was Congress legislating against? To an extent, yes. Certainly relevant. What do I look to then? So here's the proper exercise, and I think it's important to understand how it contrasts with what the trustee is advancing. And that is, start with the statute that uses knowledge unadorned. When that's so, there's actually an agreed principle of agency law that when a statute, an element of liability, turns on knowledge itself, which it does here, that's the choice of the word, then personal knowledge is required. That's from the Restatement Section 252, or I'm sorry, 272, and the In re Libler case, which the Restatement cites, and which we put on page 33 of our brief. That case has a great illustration. It talks about 46 U.S.C. 183, which used knowledge unadorned, and yet the court found that imputation would not be permitted. What about the part where the . . . are we not bound by the Fifth Circuit's eerie determination to use the objective standard in good faith under Tufta? So Tufta isn't . . . This is what the bankruptcy court said. It went through all the case law and said it had to be objective, and then said that an objective person would have been on inquiry notice. So the characterization of the objective standard is misleading. First, Tufta is not directly at issue. Any recovery by the trustee is under Section 550. Avoidance can be under Tufta or Section 548, but the only recovery can be under 550. On the issue of subjective versus objective, I think the Second Circuit's Madoff case has a good . . . It's not parallel? Is it parallel to Tufta? Yeah. In ways, yes. In ways, no. It doesn't use the same statutory language. Okay. And I think the Madoff case and other circuit authorities we've cited gets it right. The first step is a subjective inquiry. You look at what the principal actually knew, and it doesn't need to be knowledge of the entire fraud, but the jumping-off point is actual subjective knowledge. The Second Circuit characterized it as subjective. I would love to take two minutes to talk about tracing, if Your Honor will permit it. I'll give each side . . . We'll give each side two extra minutes. We still need to continue this. We can have two minutes each, additional, for each side, but can we finish this, though? Of course. You're saying it's subjective, and you're saying they didn't have an inquiry duty? There is some level, and this is actually disputed in the other circuit authorities, of the level of inquiry a principal must make once they have some actual knowledge. It's well settled that they don't need all facts of the fraud, but it's well settled that they need something to jump off from. There is no inquiry duty if on Step 1, as the Madoff case describes it, there is no actual subjective knowledge whatsoever. There's no inquiry to do if you don't know anything. Obviously, that looks past the question of imputation, which is the null . . . Didn't the reckonances think, well, this could be good, too good to be true, the returns are being promised are awfully high? Isn't that actual knowledge? Well, that was . . . Whether it is or isn't, we disagree and dispute that factual assertion and the testimony there. That was not the issue on summary judgment. The only ground the trustee moved on was imputation, and it was undisputed at summary judgment that there was no actual knowledge. But do you believe that the agent was acting only for his own purposes and not for the purposes of the principal? It seems like the principal was benefiting quite a bit, so that argument doesn't work. I would agree that's not our best argument there, because there was a distribution made to appellants. A generous distribution. It's the other part of the scope of the agency that's the problem, and, of course, this is independent from the statutory argument. But as even their lead case has held, even in their Williams v. United States case in footnote 10, what that Williams case acknowledges is that minor criminal activity or intentional torts, really only intentional torts, but occasionally minor criminal activity, can be within the scope of agency. But it said explicitly, and this is the Fifth Circuit's case, that essentially an employer's willful and malicious actions can be within the scope unless the employee's actions involve serious criminal activity. I don't think there's any dispute here that what Nordlicht was involved in is serious criminal activity, and that's the key component here that puts the activity here outside the scope of the agency relationship. Okay. Did you want to talk about tracing? Yes, Your Honor. And this is an issue, I think, that obviously got a little less time in the briefing, but I think is another very clear ground to reverse. There's a summary judgment posture. As Your Honor knows, the bankruptcy courts apply Rule 56, imported via the bankruptcy rules, just as any district court does. That creates a de novo standard of review on appeal under well-settled precedent, including the Matter of Royale Airlines case that we cite in our opening brief, which was a bankruptcy case where this court applied a de novo standard of review. The fact question faced on tracing was a statutory one under Sections 548 and 550. Namely, what was the source of the funds that were transferred to the retinences? Did they originate in the bankruptcy estate, or were they some other funds of platinum that might have belonged to a third party, or untainted funds, as the cases refer to them? That's a factual question. It's not a question committed to the equitable discretion of the bankruptcy court. Imagine if it weren't funds, but a chattel, a painting, and it was undisputed that some painting had gone to a transferee, but there was a factual dispute about whether that painting had originated at the bankruptcy estate. There would be no power under Rule 56 for the bankruptcy judge to resolve that disputed summary judgment. What we had— I think you need two more minutes each side, because we haven't even talked about the standard of review for this, which would seem to be abuse of discretion, but you argue in your reply brief is de novo. And, Your Honor, the standard of review, I think, and we say this in our opening brief as well in the standard of review section, is very clearly de novo. That's from this circuit's matter of Royal Airlines case, which was a bankruptcy case at the summary judgment posture. The only—their principal case, the trustee's principal case, is the In re West Delta case, which involved an issue of judicial estoppel at the summary judgment stage when the facts were undisputed. When there is some sort of equitable decision for the judge to make, judicial estoppel is principle one, or maybe an equitable defense like unclean hands. And the facts are literally undisputed. Isn't tracing, by definition, a tool of equity? Tracing is a fact-finding tool. The judge may have some equitable discretion to choose a tracing methodology, but he can't do so to resolve a disputed fact issue at the summary judgment stage. Just because tracing is an equitable tool does not transform the standard of review into an abuse of discretion standard of review. That's why the chattel example, I think, is a good one. Ultimately, there's just a factual question. Where did these funds originate? Are they part of the bankruptcy estate as a factual matter? Regardless of whether the bankruptcy court has some equitable authority to choose a tracing methodology at some point, he has no authority under Rule 56 to resolve that factual dispute, particularly not by kind of coming up with his own tracing methodology. What is the actual fact dispute? Well, there are two fact disputes I would point Your Honor to. One is on the core issue of were these funds traceable to, did these funds, the transfers, originate with the bankruptcy estate, the Black Elk Renaissance sale? We put forth, appellants put forth, an expert who under four standard methodologies said somewhere between zero dollars of the transfer and 21 percent of the transfer, depending on which methodology you apply, was traceable to the state. The trustee put forth its own expert, obviously supporting the traceability. That created a fact issue. That, in fact, was the exact fact issue faced in one of the Madoff cases that the trustee cites, the Security Investor Protocols Corp v. Madoff, which is 563-BR-737, where in count nine, yeah, I'm sorry. But basically, it's a classic fact issue, and the district bankruptcy court is not permitted to resolve it. If there are no other questions, I'll take my time. Thank you. Thank you. You've saved time for rebuttal. Thank you. Good morning. May it please the Court. Justin Wagner on behalf of the appellee, Richard Schmidt. The reckonances offer no viable basis for reversing in any respect the judgment of the bankruptcy court that the reckonances may not maintain the proceeds of their own agents' unlawful and fraudulent activity. The reckonances address and advance three arguments on appeal, and I will address them in the order that counsel for the reckonances addressed them before the Court here. Turning to the first issue, the issue of mootnance, I think it is telling, however, to point out that this veritable get-out-of-jail-free card of an argument, were it to have any merit, is plugged into the very end of their brief before this Court. We've done a lot of briefing on this. If the litigation trust—let me just see if we can figure out the stakes. If the litigation trust dissolved of its own force after three years, then we don't need to be here, right? I don't think that's true, Your Honor. Even if the litigation trust dissolved, there is no language in the litigation trust that reflects that there would be no wind-up powers exercisable by the trustee in that circumstance. Okay. Well, I don't remember that in the briefs, but how about this? The issue of whether it dissolved or not was appealed from the bankruptcy court, right? That is true, Your Honor. District court. If that was a final appealable judgment, given the more flexible rules of finality and bankruptcy appeals, then I think what that means is no further appeal was taken to our court from the district court, so it's over. Like, we don't reach that. There's no appellate jurisdiction to reach that. The time for appealing that has passed. Do you agree with that? Absolutely, Your Honor. So the question is, was it final or interlocutory? Mr. Coy says that it was undisputed that it was interlocutory. What's your view on it? What's your view on what the parties argued before? It was certainly disputed, Your Honor. In fact, the district court order that's cited by the Reckonances on page 51 of their brief, footnote five, I believe, that court order says that the appellants there, including the Reckonances, contended that the orders at issue were final and appealable as of right. There's nothing in the district court's determination of the appeal before it to suggest that the district court agreed. What the district court found is that the Reckonances and the other appellants there lacked standing to challenge the order. The trustee argued, though, that it was interlocutory. That's true, Your Honor. The trustee did. But separate and apart from whether the order itself, which the Reckonances argued at that point and simply reversed course before this Court without citation to any authority that would suggest that the order was not final or appealable, the district court's order of dismissal for lack of standing is very clearly a final order that if the Reckonances wanted to challenge, they were required to challenge at the time, within 30 days of the district court's disposition. And even if we just cabin our review or our view of the matter to the underlying order of the bankruptcy court, I think it's perfectly in keeping with the types of orders that this court has concluded constitute final, appealable as of right orders by one withstanding to do it, that this would fit into that category. The fact that you lack standing doesn't change the nature of the order, does it? That's true, Your Honor. But I think that that determination through an order of dismissal that standing is lacking. Right. This is a somewhat friendly question. The fact that there was no standing doesn't mean that it's not final. Absolutely. Absolutely, Your Honor. It just means that these appellants are not within the group of individuals that would have standing under the more restrictive prudential standards that apply and determining who can appeal bankruptcy court orders to pursue that appeal. And so if they wanted to challenge this issue, they had to do it back at the time. They didn't. And so the issue is waived. Separate and apart from waiver, there's no argument from the reckonances as to why the district court got it wrong in concluding that they didn't have standing to begin with. Because the standard that applies there is the aggrieved person standard, which says that in order to be able to appeal, the appellant has to show that they were directly, adversely, and financially impacted by the specific order that they're attempting to appeal. If they can't make that showing, they don't have prudential standing to pursue the appeal. The reckonances cannot argue, and I don't think that they've tried to argue before this court, that they had any type of direct negative financial impact from the bankruptcy court's determination that the trust did not automatically terminate or from the bankruptcy court's determination that the trust could be amended in terms of its termination date. And what they're trying to do now is to say, well, maybe we didn't have standing then, but by gosh, we have it now because we've got a $10 million judgment against us. There's a couple of problems with that, Your Honors. Number one, as this court explained in the Technicool's case, now matters not when it comes to standing. Standing is determined back at the time that the suit is filed ordinarily, or in this case, when we're talking about bankruptcy court orders, at the time that the bankruptcy court acted. Second, Your Honor, and so they can't come here after the fact and say we've generated standing to make this attack that we didn't have before by virtue of the passage of time and intervening events. Apart from that, Your Honors, to conclude that the reckonances can claim that they've created standing now by virtue of the fact that a judgment has been entered against them would take the rationale behind the prudential limits on who can appeal what bankruptcy orders and absolutely turn them on their heads. As this court explained in the Matter of Dean case, the reason that you have this more restrictive standard is that if everybody connected with a bankruptcy case can appeal every single order issued in the bankruptcy case, then the district courts in this court are likely going to be doing nothing other than reviewing bankruptcy court appeals. What the reckonances are asking the court to do is to say that— Only 1% of our docket at this point, so ways to go. There's a good reason for that, Your Honor, and it's these prudential limitations. If that were taken away— It's the most complicated part of our docket. It punches above its weight. So applying this standard, to accept the reckonances argument, essentially what they're saying is that if there's any place in the causal chain that ultimately leads to the entry of a judgment against them, if there's any bankruptcy court order that if you took it out of that causal chain, there couldn't be this judgment against them, then they get to challenge that in connection with an appeal of the final judgment and the adversary proceeding. If you accept that argument, not only do you eliminate the purpose behind the prudential limitations on standing, you make the problems underlying that doctrine even worse, because not only can someone like the reckonances challenge every single order the bankruptcy court entered, they can do it, in this case, three years after the fact, after these— So just to sum up, you believe that we could deal with this and find it affirmatively waived or maybe forfeited, perhaps, instead of waived, but that also you believe that they still—they don't have standing, just like the district court found. Exactly. And that would be the two ways to address this? That's exactly right. And a contrary conclusion would allow them to stand up before the court and challenge to the same extent the order appointing the trustee in the first place. For that matter, they could be before the court saying it was improvident for the bankruptcy court to confirm a plan here. And after all, if there was no plan that was ever confirmed, there never would have been a litigation trust. There wouldn't be a judgment by the trustee against them. That's obviously not the law, Your Honor. It would absolutely eviscerate these prudential limitations on standing to appeal from bankruptcy court orders. Unless somebody else has a question on that, can we hear about the agency point? Absolutely, Your Honor. The bankruptcy court properly concluded that the recknesses agent Mark Nordlich's knowledge within the scope of his agency authority, in fact, constituted the recknesses' knowledge as a matter of law. Now, the recknesses, I believe, concede, as they must, that if they had chosen to pursue this investment in PPBEO through an LLC or some other entity that they wholly owned and the knowledge of Mr. Nordlich within the scope of his agency or impute to that entity that they own and control, which would effectively impute it to them as the beneficiaries of that entity, what they're asking the court to do is to recognize a distinction that hasn't been recognized in any other jurisdiction that would say that in the case of entity principles who must act only through agents, it's perfectly okay to impute. But for natural persons who make a voluntary choice to act through agents, somehow imputation is improper. They can direct the court to no case in any jurisdiction that accepts that distinction. On the other hand— The point that they're saying that you could ordinarily impute, but because this was a distinct criminal act, all bets are off and that changes everything. And they seem to say that there's some authority in other jurisdictions that would go along with that. I think, Your Honor, that the question of criminality of the underlying conduct is a question of foreseeability rather than a question of whether or not there should be imputation at all. What authority do you cite for that? For the argument that it's foreseeability rather than it's improper to impute. I'm not aware of any case that holds that just by virtue of the fact that the conduct was unlawful conduct or criminal conduct— How about your friend on the other side said that to us just a minute ago? Because it's such a distinct criminal enterprise that it could not have possibly been something that would be imputed to them. Maybe I misheard him. Well, Your Honor, again, I'm not aware of any case that holds that the severity of the criminal acts impacts the foreseeability determination or the determination to impute other than that it might make it less likely that a particular set of fact patterns would deal with a foreseeable issue. Well, I mean, I recall some hypo in one of the cases about, you know, if you have an agent and you ask your agent to go close a gate or something like that and he shoots somebody, okay, that's criminal activity. It's not foreseeable. So if Mr. Nordlicht were not engaged in financial shenanigans but he were a serial killer, right, that might not be foreseeable. The criminal activity here was kind of, you know— It certainly was not a foreseeable way to carry out the agency authority to see about the gates being closed, to follow someone who didn't close a gate home and shoot them. That in no sense advanced the purpose of the agency authority. The same can't be said about the scope of authority here and the conduct that we're dealing with here, Your Honors. The authority that was provided here was full power and discretionary authority to act in the company, that is PPBEO's name, place instead to make the company's investments and execute any trades ancillary to such investments. Now, on these facts, it's clear that Mr. Nordlicht's misconduct was foreseeable because the entire scheme that we're talking about here consisted of trading and voting the very same Black Elk securities that the Recknitzes gave Mr. Nordlicht full discretionary authority to invest in and manage on their behalf. In that circumstance, it's clearly foreseeable that that discretion could be exercised in an improper manner, and there would be no problem with imputation of that knowledge of that scheme. But it's not even necessarily necessary for the Court to conclude that knowledge of all of the intricacies of the fraudulent scheme that Mr. Nordlicht had are imputed to the Recknitzes because part and parcel of that knowledge that Mr. Nordlicht had was knowledge of the dire financial condition that Black Elk was in at the time these transfers were happening. Certainly, it's within the scope of Mr. Nordlicht's authority to have information about the when the whole purpose of his agency authority is to manage investments in Black Elk securities. So even if there is only that much of an imputation, we would still reach the conclusion that Mr. Nordlicht, and thus the Recknitzes, knew about enough facts to create inquiry notice that would have allowed them to discover that these were avoidable transfers. And I thought Mr. Coy argued that the basis for summary judgment here was not sort of I knew some facts that put me on inquiry notice, but instead it was just pure imputation of the agent's knowledge to the principal. It is, Your Honor. And what I'm saying is even if you assume that the Recknitzes' knowledge was that they had absolutely no knowledge, which, by the way, is something we obviously dispute. But even if you make that assumption, if all that you impute to them is Mr. Nordlicht's knowledge regarding the dire financial condition of Black Elk, that would be enough on its own for Mr. Nordlicht, even if he hadn't been perpetrating the fraud personally, for him to inquire and evaluate whether or not these were avoidable transfers. If the Recknitzes had that very same knowledge, if that's the limited scope of the inquiry notice that defeats a good faith defense. Who was the agent for the Recknitzes? Was it Nordlicht or PPBE Holdings? Well, Mr. Nordlicht was a sub-agent, Your Honor, by virtue of the fact that PPBE Holdings, which was the managing member, is an entity that is controlled by Mr. Nordlicht. And I don't think that there's any dispute that he's going to exercise, he is wielding that agency authority on behalf of that entity. And so the knowledge that he has is imputed to that entity that's the direct agent. And I haven't seen any argument in the briefing or any of the case law that you would apply different imputation rules based on the fact that we're dealing with a sub-agent. Wasn't the sub-agent PPBE Management? It was not, Your Honor. Well, I suppose that's possible as well. There was a management company that PPBE Holdings authorized to act on behalf of PPBEO, but Mr. Nordlicht is also the managing member of PPBE Management as well. So any way you slice it, we're talking about Mark Nordlicht acting on behalf of these entities. Is there any evidence in the record connecting Nordlicht to the appellants? Connecting Nordlicht to the appellants in the sense of what, Your Honor? Well, if we're talking about knowledge, is there any evidence? You said it's disputed. You dispute that the retinacists did have knowledge. Right. We just heard from opposing counsel that they didn't. Why isn't that a fact issue that should have been considered by the bankruptcy court? Because even if you assume that the retinacists had no knowledge themselves that would have placed them on inquiry notice regarding the voidability of these transfers, what we're saying is that Mr. Nordlicht very clearly had that level of knowledge, and even if you impute only a subset of the knowledge that he had, if you conclude that that's the only set of knowledge, knowledge about the dire financial circumstance of Black Elk, that would be enough to satisfy the inquiry notice standard, even if you assume that the retinacists didn't know anything else in the world. Of course, and— Did they know of him? Sorry, Your Honor? Did they know of him? I believe that they did, Your Honor, and I believe that the deposition testimony is that he spoke with them. It's possible that other platinum agents were engaged in those conversations as well. What we do know from his deposition testimony, however, is that he did think it sounded perhaps too good to be true when he tried to withdraw his money and was told, why don't you put it into another investment for double the return and, by the way, a guaranteed return as well? So I don't think it's disputed that he had that level of knowledge. He made sure that they got their $200-and-something thousand at the time for their interest payment or something? Is that not associated with him? That he made sure that the payment was received? That's correct. There were two distributions to the retinacists that are at issue, Your Honor. One of them that happened in August for the interest payment, the $270,000 roughly, and then another one a little bit later in the first part of September for the return of the principal, the $10 million that was invested. And even if the Court were to conclude that all of Mr. Nordlich's knowledge somehow was outside the scope of this agency authority, this broad discretion to manage and invest in Black Elk Securities, we still have the fundamental agency principle that if the principal is benefited by the unlawful conduct of the agent, that the principal cannot retain the benefits of that, regardless of what the scope of the agency is. Because once the principal is apprised of the illegality and the fact that the agent didn't have the authority to send them the money, they don't get to keep the money. That's just a basic principle. I mean, the Nordlichs are in front of the Court effectively saying, we realize that our agent, Mark Nordlich, gave us stolen funds, but we want to keep them. Agency law does not allow that to happen, and there is nothing in the language of Section 550 or anywhere else in the Bankruptcy Code that would suggest that Congress intended to make it easier than it would be at the common law for a subsequent transferee, a out of the bankruptcy estate. Speaking of recipient of tainted funds, maybe you want to talk about tracing. Absolutely, Your Honor. Because, you know, that's the whole point of tracing is to figure out whether they're actually tainted or not. Do you, I guess, address first what is the standard of review? Is it abuse of discretion or de novo? You'll be surprised to hear that I don't say it's de novo, Your Honor. It's not de novo based on this Court's decision in the Durham case, which says that choosing a tracing methodology is an exercise of equitable powers, and the Bankruptcy Court has discretion to do that. We're only going to review for an abuse of discretion. That doesn't change in the summary judgment context, because all a tracing methodology is is an analytical tool that's designed to try to line up the funds with reality, with financial reality to the maximum extent possible. And so in the summary judgment context, if you have a particular set of facts that is undisputed and established as a matter of law, there's no reason the Bankruptcy Court wouldn't exercise exactly the same discretion in saying, what tracing methodology makes sense on this undisputed set of facts? Is it true that the District Court sort of went off on his own on this issue? I don't believe that it did, Your Honor. In other words, I mean, didn't accept either side's methodology? Well, that part is true, if that's what you mean by off on its own. If off on its own meant not following any kind of precedent, then I would disagree. We've cited our own. He said, I can do better than these experts, basically, and went through and calculated it all himself, and didn't he? And the very experienced Bankruptcy Court judge did go through and do his own calculations, and he made an assumption in that. He said it was the intent of Platinum to take that money from the fraud and find a way to pay it over to the group of the investors that included the Rechnicks. Is that assumption, is that a problem? Your Honor, I would take issue with characterizing that part of Judge Isger's analysis as an assumption. The conclusion that Platinum's intent was to pay PPBO investors off and redeem their job funds is a matter of undisputed fact. Undisputed. So there's not a fact issue on that whatsoever. So if we had sent it back for trial, I'm not saying we are, but there's no need to do that because it's clear that that was absolutely the intent. I think that's exactly right, Your Honor. In fact, over the course of a two-hour hearing on this motion for summary judgment, the Rechnicks' counsel were asked by Judge Isger no less than 15 times, point me to the evidence in the record that disputes that Platinum's intent was to pay all of these PPBO investors out of these fraud funds. And they couldn't point to anything. The only thing that they point to on appeal is that some of the money that the Rechnicks' got came to them a little bit less than two weeks after other people got the money. There's no change in the accounts in that time. There's no additional funds that are placed into the account that are untainted funds that would have to be considered. There's no evidence of any other communication suggesting a change in the intent that's reflected in the earlier e-mail communications, and so there's no basis on which a factfinder could make an inference that there was a change in that intent. When we have that undisputed evidence of intent, tracking through to the financial reality of the transaction is exactly what Judge Isger did. He had the discretion to do that under the case law. The Lee case, which we've cited, says that ordinarily the lowest intermediate balance rule assumes that untainted funds are sent out of the account first, but that's a rule for the benefit of the beneficiary of the trust. You can decide to trace the funds if it's more expedient to do that, and that's exactly what happened here. But even if the bankruptcy court was totally out of school and the only thing he could do is apply lowest intermediate balance rule the way that they say it should be applied, their complaint is wholly academic, because under that lowest intermediate balance application, all of these funds were fraud funds, and the way we know that is because a grand total of $7.2 million of untainted funds were involved in the accounts at issue in the relevant time frame. If we assume that every dollar of that $7.2 million was transferred into the account that the reckonances were paid out of, and that every dollar of that went out first, it's that exceeded that $7.2 million, leaving the only funds left in the account as the fraud funds. Thank you, Counsel. Thank you, Your Honor. Thank you, Your Honor, for the extra time to address these issues. I'd like to start where I had the least time, which is tracing, and first address Counsel's point about the standard of review. There's no authority in this circuit that an abuse of discretion standard applies when the district judge has found facts. If this were an equitable defense situation, there, a district judge might have some discretion at the summary judgment stage to, when the facts, material facts, are wholly undisputed, to apply an equitable defense like judicial estimation. Well, they say that the counsel was asked 15 times to point to some evidence that was a dispute during the hearing, and there was no pointing to any evidence, so then why wasn't that exactly appropriate here? I disagree with that characterization of the transcript and would urge the Court to read it, but there are two pieces of disputed evidence. One is the admissible expert testimony on both sides disputing tracing. That obviously can be summary judgment evidence. The issue of intent also was disputed, and intent is a classic triable issue. Where is the evidence that supports that that was not their intention for Platinum to do that? There's two inferences that could have been drawn to defeat summary judgment here. The first one is that if the Court looks at the documents cited in the briefing put forth by the trustee, those are available at ROA 2720 and ROA 1492. What you'll see is an intent for the Renaissance sale proceeds to be distributed immediately at the end of August of 2014 into the Platinum entities. They don't say anything about the immediate intent to distribute those to the investors in the Platinum entities, like the Rechnitzes. So the notion that the District Court relied on was that there was a specific intent to give really the Rechnitzes this distribution from the Renaissance sale proceeds. When you take all inferences in favor of the non-moving parties, the Court must, the inference could be drawn only that there was an intent to distribute to the Platinum funds, but not to the ultimate investors. That's the first error. The second inference that creates a disputed fact issue is that there was an intense urgency in these documents. We cite them there in the record. I pointed you to a couple of our brief points to Moore. An intense urgency to immediately distribute those funds. Again, not to the investors, but to the funds. By the time the Rechnitzes received their money, it was weeks later. There are no documents pointing specifically to the Rechnitzes here. There are no documents suggesting the same urgency existed weeks later when the $10 million distribution was paid. That too would support an inference that whatever the specific intent was at the end of August, it was absent by the middle of September, which is what counsel repeatedly pointed the bankruptcy court to during that hearing that was referenced. What do you say about the 7.2 being long gone? That's part, that's bound up in the factual question of were these funds traceable? As we've explained, there's four standard methodologies to trace. But under LIBOR, the normal straightforward method, there's not enough money of not tainted money to make your case. We disagree with that. Explain that. Is there enough money of non-tainted money to make your case?  Our expert, Erica Garner, appellant's expert, applied the LIBOR test. No one argued that that methodology was wrong, nor the numbers, because the bankruptcy court used her numbers. Her expert analysis concluded that only 4% of the funds distributed to the Rechnitzes were tainted. That was admissible evidence. There's a dispute. Sure, there's an expert dispute, but that's a triable issue. But is the 7.2 long gone by the time it gets to these distributions? No, not according to the expert of the appellants. There's a disputed fact issue. Tracing methodologies, of course, are artificial, right? Money is fungible. There are various methodologies used to try to do what the statute requires, make sure the funds recovered by the trustee are part of the bankruptcy estate. So there are competing expert testimony that creates a fact issue. Just in the last 20 seconds, it's important from a policy perspective, too, because what Judge Isger did is the opposite of the lowest intermediate balance rule. He took the fraud funds out first. I mean, I'm sorry, yeah, he took the fraud funds out first. The risk to that is Platinum had other innocent investors. The law wouldn't want a bankruptcy trustee to be able to seize third-party funds. The lowest intermediate balance rule and related equitable considerations protects the trustee from seizing funds that aren't part of the bankruptcy estate. Thank you.